UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. _____

| | |
|---|---|
| **BURGANDY GODDARD and JEANNE MARIE KRAUSS,** <br><br> **Plaintiffs,** <br><br> v. <br><br> **IREDELL COUNTY PARTNERSHIP FOR YOUNG CHILDREN, INC.,** <br><br> **Defendant.** | **COMPLAINT** |

NOW COMES the Plaintiffs, Burgandy Goddard and Jeanne Marie Krauss, by and through counsel, and alleges the following against Defendants:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff BURGANDY GODDARD (hereinafter "Ms. Goddard") is an individual citizen and resident of Iredell County, North Carolina.

2. Plaintiff JEANNE MARIE KRAUSS (hereinafter "Ms. Krauss") is an individual citizen and resident of Iredell County, North Carolina.

3. Defendant IREDELL COUNTY PARTNERSHIP FOR YOUNG CHILDREN, (hereinafter "ICPYC") is a non-profit corporation organized and existing under the laws of the state of North Carolina. ICPYC is licensed to conduct business in North Carolina and has a principal place of business in Iredell County, North Carolina.

4. Defendant ICPYC is an employer for purposes of 42 U.S.C. § 12111(5)(A). On information and belief, Defendant ICPYC employs more than 15 people in Iredell County where it employed Plaintiffs.

5. Plaintiffs bring this action pursuant to 42 U.S.C. 12101, et seq. This court has original jurisdiction over those federal claims under 28 U.S.C. § 1331. Plaintiffs also bring

–1–

wrongful discharge claims based on the same facts under the common law of North Carolina. This court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6. The unlawful employment practices alleged in this complaint were committed in the Western District of North Carolina. Venue is proper under 28 U.S.C. § 1391(b) and (c).

## II.  ADMINISTRATIVE PROCEDURES

7. Plaintiff Burgandy Goddard timely filed a charge of discrimination against ICPYC with the Equal Employment Opportunity Commission ("EEOC") on or about May 12, 2023.

8. On or about December 20, 2024, Ms. Goddard received a notice of right to sue from the EEOC entitling her to commence this action within 90 days of her receipt of that notice.

9. Ms. Goddard has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

10. Plaintiff Jeanne Marie Krauss timely filed a charge of discrimination against ICPYC with the Equal Employment Opportunity Commission ("EEOC") on or about February 27, 2024.

11. On or about March 12, 2025, Ms. Krauss received a notice of right to sue from the EEOC entitling her to commence this action within 90 days of her receipt of that notice.

12. Ms. Krauss has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## III.  FACTS

**A.  Burgandy Goddard**

13. Plaintiff Burgandy Goddard was hired as a Professional Development Specialist by ICPYC in September 2022 and began work on October 3, 2022.

14. She was terminated 44 days later on November 16, 2022 after discussing her disability and need for accommodations in her training with her supervisor, Sheila Clark.

15. Ms. Goddard was first diagnosed with Attention Deficit Disorder (ADD) as a child (age 8) and was medicated until pubescent age. She has also been diagnosed with anxiety, depression, and mild overt compulsive disorder.

16. ADD is a neurodevelopmental disorder whose symptoms include difficulty focusing, a tendency to get distracted easily, poor organizational skills, poor time management skills, forgetfulness, and restlessness. It is a lifelong condition and is recognized as a disability under the ADA.

17. Ms. Goddard's symptoms include difficulty focusing and staying on task. She often has to read information several times before it is retained, which makes learning new material challenging without proper support. She often has a slower learning curve and needs to read along while the computer reads the material out loud to aid retention. She learns best using kinesthetic learning techniques (auditory, visual, hands-on). Playing music in the background aids in her ability to focus on specific tasks.

18. Ms. Goddard informed her supervisor, Sheila Clark, that she has ADD approximately two weeks after she was hired during a "check-in" meeting.

19. At that time, she asked that her ADD be accommodated with a "tell, show, try" approach rather than the "tell only" or lecture approach they were using in her training. She also asked to be allowed to wear headphones during work to help her focus and to be given more time to learn new tasks due to her learning disability.

20. No changes were made to the way she was being trained after this accommodation request, but soon after this conversation her training was stopped, and she was given a series of small tasks to complete. Her request to be allowed to wear headphones during work was denied.

21. Ms. Goddard was never told she was not performing her work properly or that her work was sub-par. She was never given any written warnings or told that her work performance was not adequate.

22. Contemporaneous written records of Ms. Goddard's work reflect that she was performing her job without any complaints from her supervisor, Ms. Clark.

23. A few days before her termination, Ms. Goddard notified ICPYC for a second time about her ADD when she shared with Ms. Clark that she was seeking medical help for her ADD and had made a medical appointment for November 21, 2022 for that purpose.

24. On November 15, 2022, Ms. Goddard met with the executive director of ICPYC, Lisa Familo. During this meeting, Ms. Goddard, who was emotional and upset about the death of a close family friend, shared with Ms. Familo that she was seeking medical treatment for her ADD and anxiety the following week. Ms. Familo advised her to take the rest of the day off.

25. The very next day – on November 16, 2022 -- Ms. Goddard was fired by telephone.

26. She was instructed to return to the office after hours to return her computer, collect her belongings, and meet with Ms. Clark and Ms. Familo.

27. Clark and Familo met Ms. Goddard in the parking lot and refused to let her enter the building. She returned ICPYC property and they provided her with COBRA paperwork and some personal belongings.

28. During the conversation in the parking lot on November 16, 2022, Ms. Clark admitted that Ms. Goddard was not "underperforming on anything". In addition, Ms. Clark admitted to being aware of Ms. Goddard's disability and told her she was fired because her mental health was a "concern".

29. Ms. Clark told Ms. Goddard that she was worried that Ms. Goddard might "overlook things" that Ms. Clark would have to redo later. When asked for an example where that happened, Ms. Clark said there was nothing major that Ms. Goddard had overlooked.

B. **Jeanne Marie Krauss**

30. Jeanne Marie Krauss was born on June 8, 1962. She was employed as finance director/contracts manager with ICPYC from 2019 until 2023.

31. In 2022, she was asked by executive director Familo to obtain certification from SHRM (Society for Human Resource Management) and she completed the certification in 2023.

32. She was given responsibility for managing and coordinating personnel matters, including payroll, benefits, COBRA packets, and providing other exit information for departing employees.

33. At her last performance appraisal on November 1, 2022, Ms. Krauss received an excellent score and received the maximum 5% merit pay increase. This was her third performance appraisal, and she received an excellent score and a full merit increase on each one.

34. In 2020, Ms. Krauss objected to ICPYC's termination of two employees over the age of 60 in favor of younger employees.

35. Ms. Krauss complained that the reasons given for these terminations (financial woes) were untrue because she was aware of a large influx of funds to ICPYC from several sources that were received around the same time.

36. After she raised these objections, Familo and assistant executive director Lisa Pullis questioned Ms. Krauss's attitude and commented on her age.

37. During her employment with ICPYC, Ms. Krauss was repeatedly subjected to age-based comments and smears from a group of younger staff members at ICPYC, including Sydney Taylor and Mallory Renegar. Ms. Krauss overheard comments about the "farty old lady" as she walked by these younger employees.

38. These younger employees frequently questioned Ms. Krauss's work to Ms. Familo. Ms. Krauss reported that she believed these complaints against her were fueled by age-based animus to Ms. Familo.

39. In March 2023, Ms. Krauss was criticized by several younger employees for allowing two employees to leave the office early because of tornado warnings in the vicinity of their homes and for not closing the office for everyone else.

40. Following this episode, several of the younger employees began harassing Ms. Krauss in a concerted effort to find payroll or other mistakes. Ms. Krauss again reported this behavior to Ms. Familo who insisted she performed an investigation, but no action was taken.

41. Ms. Familo began referring to the younger employees as "mean girls" after this, but she took no action against them for their behavior towards Ms. Krauss.

42. At one point, Ms. Pullis, who was aware of Ms. Krauss's complaints, gave Ms. Krauss a gift of a t-shirt depicting a witch on a broomstick. This made Ms. Krauss the butt of jokes and created an environment in which age-based harassment was accepted and tolerated.

43. Ms. Krauss learned of Ms. Goddard's termination when she was asked on November 16, 2022 to provide COBRA forms and property return forms to Ms. Familo. Ms. Krauss was not made aware of Ms. Goddard's disability and was not involved in her termination.

44. All staff at ICPYC, including Ms. Krauss, were instructed to leave at 4:45 before Ms. Goddard was to arrive. Ms. Krauss offered to stay and was told she was not needed.

45. The next day, when Ms. Krauss learned that Ms. Goddard's termination meeting had taken place in the parking lot after hours, she complained to Ms. Familo that the way the termination was handled was unprofessional, unfair, and undignified, like kicking garbage to the curb.

46. In April 2023, when ICPYC received a letter from Ms. Goddard's counsel raising possible legal claims against ICPYC, Ms. Krauss was instructed by Ms. Familo to prepare a letter of termination for Ms. Goddard, which had not been done previously.

47. Upon learning of Ms. Goddard's disability claim, Ms. Krauss asked Ms. Familo if ICPYC had engaged in any process to assess Ms. Goddard's requests for accommodation or to discuss her disability before terminating her. She did not receive a response.

48. She was also told to research the ICPYC's handbook to "validate" the Goddard termination decision. She performed these tasks under duress and in fear of her job.

49. During this time, Ms. Krauss observed Ms. Clark typing up notes and creating records to support the decision to terminate Ms. Goddard.

50. After raising objections to ICPYC's handling of Ms. Goddard's termination, Ms. Krauss's work environment shifted and became hostile and demoralizing. She was criticized for not maintaining a "positive" attitude.

51. Ms. Krauss identified several instances in which employees – all younger than Ms. Krauss -- violated ICPYC's fiscal policies but she was criticized for raising objections. She began to be excluded from planning meetings because she insisted on compliance with ICPYC's financial procedures.

52. During the winter of 2022-23, Ms. Krauss requested a meeting with Don Isenhour, ICPYC's CPA; Tom Mitchell of ICPYC's grantor agency, North Carolina Partnership for Children, aka Smart Start; Lisa Familo; and ICPYC's fiscal specialist, Carol Setzer to develop proper protocols for handling funds collected at ICPYC's spring luncheon.

53. After the meeting, Ms. Krauss wrote up procedures and policies with a copy to Smart Start and the CPA. She identified Ms. Setzer as the person designated to handle cash at the luncheon.

54. A few days before the luncheon, Lisa Pullis sent a list of tasks for the luncheon and identified Mallory Renegar, another employee with no responsibility for the finances of the Partnership, to handle the cash instead of Ms. Setzer. Ms. Krauss's objections to this change were dismissed. She was told she lacked self-awareness and was given a coaching note.

55. In April 2023, Ms. Krauss objected to using more expensive cupcakes provided by a younger staff member's mother for the ICPYC's fundraising luncheon rather than seeking bids from multiple vendors. This policy was required by cost accounting principles set forth by ICPYC's partner agency, Smart Start. Her suggestion was ignored.

56. Ms. Pullis later produced a memo in which she claimed to have requested other bids. This was done after the fact to appease auditors and grant monitors.

57. Ms. Krauss raised other objections to ICPYC policy violations, including hiring friends, paying without an invoice, paying for services before they were completed, or using ICPYC laptops for personal business. The employees who engaged in this misconduct were younger than Ms. Krauss and their violations of policy were ignored or minimized by ICPYC management. Ms. Krauss was given coaching notes for raising her concerns.

58. Following her complaints about Ms. Goddard and multiple financial improprieties in violation of ICPYC policies, Ms. Krauss was given a coaching note and moved from a large office with windows into a small room isolated away from other staff and near the bathroom. Two employees told her they were instructed not to socialize with Ms. Krauss.

59. When Ms. Krauss suffered from cardiac symptoms during an ICPYC luncheon, Ms. Familo told her "I don't care – put on a happy face." Ms. Krauss stayed through the event and later received a corrective action that her attitude needed improvement.

60. Throughout her employment, Ms. Krauss was treated differently than younger employees who violated ICPYC policies and were not disciplined.

61. ICPYC selectively enforced its policies more harshly against its older employees like Ms. Krauss while overlooking violations by younger employees.

62. Ms. Krauss's complaints about ICPYC's disregard of financial policies, treatment of older employees, and Ms. Goddard's termination led to a deliberate scheme to paper Ms. Krauss's record with coaching notes about her attitude.

63. Ms. Krauss was terminated on September 5, 2023.

## IV. CLAIMS FOR RELIEF
## AS TO BURGANDY GODDARD

### COUNT I
### Americans With Disabilities Act
### 42 U.S.C. 12101 *et seq.*

64. Plaintiffs restate and incorporate herein the allegations contained above as if fully set forth herein.

65. Ms. Goddard's Attention Deficit Disorder (ADD) is a chronic neurological condition that qualifies as a disability under the ADA.

66. Ms. Goddard's ADD substantially limits one or more major life activities including learning, reading, concentrating, thinking, and working, as these cognitive functions are significantly affected by the condition.

67. Defendant was aware of Ms. Goddard's disability of ADD and her request to accommodate her disability with a modified training regimen and the use of headphones.

68. Ms. Goddard discussed her disability with her supervisor, Ms. Clark, and executive director, Ms. Familo, including her specific plan to seek additional medical treatment for her condition on November 21, 2022.

69. Defendant never engaged in any iterative process to assess the reasonableness of Ms. Goddard's accommodation requests.

70. Defendant rejected Ms. Goddard's accommodation requests without any consideration or discussion of the reasonableness of her requests.

71. Ms. Goddard is a qualified individual able to perform the essential duties of her job, with reasonable accommodation as needed, as she had been successfully performing the job duties with positive feedback from her supervisor since she was hired.

72. With proper accommodation for her disability, Ms. Goddard would have been able to successfully continue in her position at ICPYC.

73. Ms. Goddard qualified as an individual with a disability in that she was actually disabled and was perceived as such.

74. Defendant otherwise regarded Ms. Goddard as disabled at the time of her termination.

75. Ms. Goddard's disability, her status as an individual with a disability, and her requests for accommodation were motivating factors in Defendant's termination of Ms. Goddard.

76. Defendant's failure to accommodate Ms. Goddard's disability by refusing to provide her with a modified training regimen and prohibiting the use of headphones during work was due to her disability.

77. Ms. Goddard suffered an adverse employment action when Defendant terminated her employment on the basis of her disability.

78. Defendant admitted that Ms. Goddard was not terminated because she was underperforming at her job.

79. Defendant admitted that Ms. Goddard's dismissal was because her mental health was a "concern."

80. As an actual, proximate, and foreseeable result of Defendant's actions, Ms. Goddard has suffered lost back and front pay, lost benefits, emotional distress, physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and her peace of mind has been disturbed.

81. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Ms. Goddard's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Ms. Goddard is entitled to recover punitive damages.

## COUNT II
### ADA Retaliation
### 42 U.S.C. 12101 *et seq.*

82. Plaintiffs restate and incorporate herein the allegations contained above as if fully set forth herein.

83. Defendant, by and through their managers and officials acting on behalf of Defendant, and within the scope of their employment or authority, retaliated against Ms. Goddard in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq.

84. Ms. Goddard suffers from Attention Deficit Disorder (ADD) which is a chronic neurological condition that qualifies as a disability under the ADA.

85. Ms. Goddard's ADD substantially limits one or more major life activities including learning, reading, concentrating, thinking, and working, as these cognitive functions are significantly affected by the condition.

86. Ms. Goddard engaged in statutorily protected activity by requesting reasonable accommodations for her disability under the ADA.

87. Defendant terminated Ms. Goddard within a short time after she reported her disability and requested accommodation.

88. Defendant engaged in unlawful retaliatory employment practices in violation of the ADA when they terminated Ms. Goddard because she engaged in activity protected by the ADA.

89. The unlawful employment practices complained of were intentional and were performed by Defendant with malice and/or reckless indifference.

90. As an actual, proximate, and foreseeable result of Defendant's actions, Ms. Goddard has suffered lost back and front pay, lost benefits, emotional distress, physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and her peace of mind has been disturbed.

91. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Ms. Goddard's rights. Defendant's officers,

directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Ms. Goddard is entitled to recover punitive damages.

## COUNT III
### Wrongful Discharge in Violation of Public Policy

92. Plaintiffs restate and incorporate herein the allegations contained above as if fully set forth herein.

93. Ms. Goddard was an at-will employee of Defendant.

94. Defendant employed at least fifteen (15) employees at all relevant times.

95. The public policy of North Carolina, as codified in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2(a) seeks to protect and safeguard the opportunity and right of all individuals to "seek, obtain, and hold employment without discrimination" on the basis of disability ("handicap").

96. Defendant violated the public policy of the state as expressed in N.C.G.S. § 143-222.2 by terminating Ms. Goddard because Defendant regarded Ms. Goddard as having a physical or mental impairment which substantially limits one or more major life activities.

97. Ms. Goddard qualified as an individual with a disability in that she was actually disabled/handicapped and was perceived as such.

98. Defendant violated North Carolina public policy by terminating Plaintiff because of actual or perceived disability and/or handicap.

99. As an actual, proximate, and foreseeable result of Defendant's actions, Ms. Goddard has suffered lost back and front pay, lost benefits, emotional distress, physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and her peace of mind has been disturbed.

100. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Ms. Goddard's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Ms. Goddard is entitled to recover punitive damages.

# V.  CLAIMS FOR RELIEF
## AS TO JEANNE MARIE KRAUSS

## COUNT IV
### Age Discrimination in Employment Act

101. Plaintiffs restate and incorporate herein the allegations contained above as if fully set forth herein.

102. Ms. Krauss was over the age of 40 at all relevant times and is within the group of individuals protected by the Age Discrimination in Employment Act.

103. Defendant employs at least fifteen (15) employees at all relevant times.

104. Ms. Krauss was qualified for her position of finance manager and was performing her job at an excellent level at the time of her most recent performance appraisal and at every prior performance appraisal.

105. Ms. Krauss was treated differently by the Defendant than a group of younger employees in terms of discipline and job benefits in that she was ostracized and harassed after making complaints about policy violations.

106. The policy violations Ms. Krauss reported were ignored or minimized because they were done by younger employees.

107. Defendant engaged in a pattern of dismissing policy violations by younger employees and escalating policy violations of older employees like Ms. Krauss.

108. Ms. Krauss was terminated based upon an alleged violation of policy. No other employee has ever been terminated for violation of this policy.

109. As an actual, proximate, and foreseeable result of Defendant's actions, Ms. Krauss has suffered lost back and front pay, lost benefits, emotional distress, physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and her peace of mind has been disturbed.

110. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Ms. Krauss's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Ms. Krauss is entitled to recover punitive damages.

## COUNT V
## ADA Retaliation
## 42 U.S.C. 12101 *et seq.*

111. Plaintiffs restate and incorporate herein the allegations contained above as if fully set forth herein.

112. Defendant, by and through their managers and officials acting on behalf of Defendant, and within the scope of their employment or authority, retaliated against Ms. Krauss in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq.

113. Ms. Krauss engaged in statutorily protected activity by objecting to Defendant's treatment of Ms. Goddard in violation of her rights under the ADA.

114. Defendant engaged in unlawful retaliatory employment practices in violation of the ADA when they terminated Ms. Krauss because she engaged in activity protected by the ADA.

115. The unlawful employment practices complained of were intentional and were performed by Defendant with malice and/or reckless indifference.

116. As an actual, proximate, and foreseeable result of Defendant's actions, Ms. Krauss has suffered lost back and front pay, lost benefits, emotional distress, physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and her peace of mind has been disturbed.

117. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Ms. Krauss's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Ms. Krauss is entitled to recover punitive damages.

## COUNT VI
## Wrongful Discharge in Violation of Public Policy

118. Plaintiffs restate and incorporate herein the allegations contained above as if fully set forth herein.

119. Defendant's termination of Plaintiff Krauss constituted discrimination on account of her age and thereby violated the public policy of the state as expressed in N.C.G.S. § 143-222.2.

120. The cited statute prohibits the discharge of an employee on account of age.

121. Defendant's termination of Plaintiff Krauss because of her age therefore constituted wrongful discharge in violation of that express public policy of the State of North Carolina.

122. As an actual, proximate, and foreseeable result of Defendant's actions, Ms. Krauss has suffered lost back and front pay, lost benefits, emotional distress, physical distress, anxiety, depression, embarrassment, humiliation, physical pain and suffering, and her peace of mind has been disturbed.

123. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Ms. Krauss's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Ms. Krauss is entitled to recover punitive damages.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray the Court for the following relief against Defendant:

1) Pursuant to Plaintiff Goddard's claims in Count I (ADA) and Count II (wrongful discharge), consequential damages, special damages, punitive damages, back pay, front pay, damages for emotional distress in an amount in excess of ten thousand dollars ($10,000.00), plus prejudgment interest, reasonable attorneys' fees, the costs of this action, and injunctive relief to deter similar misconduct in the future;

2) Pursuant to Plaintiff Krauss's claims in Count III (ADEA), Count IV (ADA retaliation), and Count V (wrongful discharge), consequential damages, special damages, punitive damages, back pay, front pay, damages for emotional distress in an amount in excess of ten thousand dollars ($10,000.00), plus prejudgment interest, reasonable attorneys' fees, the costs of this action, and injunctive relief to deter similar misconduct in the future;

3) For all issues triable by a jury to be so tried; and

4) For all other relief to which Plaintiffs may be entitled in law or in equity, which the Court deems just and proper.

DATED:  20 March 2025

BY: _____
Bert J. Miano
NC State Bar No. 49813
Miano Law PC
1213 West Morehead Street
Fifth Floor, Unit #99
Charlotte, NC  28208
Phone: (704) 275-7199
Fax:  (704) 630-7199
Email:  bmiano@mianolaw.com
*Attorney for the Plaintiff*